Good morning. May it please the Court, Doug Whitney for Appellant, Apollo Education Group. With me at council table is Mark Hirsch. I'd like to reserve five minutes for rebuttal if I may. In granting summary judgment, the District Court concluded that National Union acted reasonably as a matter of law when it refused to consent to the backdating settlement. The District Court's decision should be reversed for any and all of the following three reasons. First, the District Court applied the wrong legal standard in judging the reasonableness of National Union's refusal to consent. Secondly, the District Court ignored all of the evidence Apollo submitted regarding the objective reasonableness of the backdating settlement. Third, the District Court improperly construed all inferences in National Union's favor in granting its argument. I'd like to ask you a question about your thoughts on certification to the Arizona Supreme Court. What the Arizona courts have said, what Morris says, what Morris and his progeny say seems to me to be central to this case. And as you acknowledge, Arizona courts have not squarely addressed the meaning of the phrase, shall not be unreasonably withheld in the context of a director and officer's policy where the insured retains the duty to defend. Should this court certify the question of Arizona state law to the Arizona Supreme Court? We do not believe, Your Honor, that certification is necessary or appropriate here for the following reasons. First, the court's decision in Morris is not limited to duty to defend cases on its face. And if you look at the court's decision in Morris, it says there's a difference between duty to defend and duty to pay. And in this case, we're looking at the duty to pay because while the insurer was honoring the duty to defend in that case, it was not honoring the duty to pay in a guaranteed way because it issued the reservation of rights. And it was that issuance of the reservation of rights that put the insured in a precarious position combined with the fact that the insured was not guaranteed coverage because of the reservation of rights as well as the potential for a judgment in excess of policy limits. Both those are present here. So we don't see any need to extend the Morris doctrine. We think it applies on its face and encompasses the situation before this court. Now, I understand that argument, but Morris, just to play devil's advocate, and I'm interested in your thoughts, of course, I understand your interpretation of Morris, but Morris does not squarely address the issue before this court. It does not address the specific language, Your Honor, highlighted in the question. That is correct. There is no tension. There's no countervailing opinion in Arizona law. There is the Morris line of cases, which is But when we're interpreting Arizona law and you're asking us to look at the state court of appeal opinions, our mission or our role is to say, is to think, would the Arizona Supreme Court basically adopt that position? What is, you know, we should look to the court of appeals decision, but ultimately the question first is, what is the Arizona Supreme Court going to do? Understood, Your Honor. There's another consideration in thinking about certification, and that's would it be dispositive? Let's look at courts outside of Arizona and how they've looked at the language unreasonably withhold consent. We have three very similar duty to advance cases, so they're not duty to defend cases, involving settlement of securities class actions. Two of them that involve national union, the exact same policy language. In each case, national union or the insured rejected the well-founded opinions of highly qualified trial counsel and said, we think the settlement, not withstanding that it's recommended by trial counsel, is premature or excessive. Each of those courts have said, a reasonable jury could find that the settlement was objectively reasonable. If that's the case, it would be unreasonable for the insurer to refuse the consent. What does objectively reasonable mean? Whose perspective are we supposed to take? So the court in Morris and subsequently in Tenney, the Arizona Supreme Court has articulated that standard, and it's what a reasonably prudent insured, in its position, given the risks it is facing, the liability it is facing, and the underlying litigation, what would it pay to settle that risk? In Tenney- Regardless of insurance coverage. Correct. And what the court clarified in Tenney, and I think it addresses one of the arguments that national union is making, is it has to be financial risk. The insurer is not required to take on consideration of collateral issues that don't go to the financial risk and judgment. What we have in this case, and it's undisputed in the record, trial counsel was highly qualified, believed that there was hundreds of millions of dollars in exposure to Apollo in the event of remand. Trial counsel believed that the settlement posture would be horribly unattractive. The hundreds of millions of dollars of exposure was far in excess of Apollo's insurance coverage. Apollo's appellate counsel, highly qualified, believed that there was at least a 50 percent chance that this court would reverse the underlying dismissal of the backdating litigation. The settlement was reached only after a year's worth of arm's length negotiation before a mediator that national union recommended, and only after the issuance of a mediator's proposal. And the record is undisputed that Apollo's trial counsel believed the settlement was the lowest possible achievable settlement, and a great deal for Apollo. And it represented only a tiny fraction of Apollo's potential exposure. I'm not sure that the expressed opinion of Apollo's trial counsel, I have to assume that person was aware of Apollo's insurance coverage, and was aware of how much was left in the insurance policy. So I look at a settlement that perhaps not by coincidence winds up reaching agreement at a number that fits neatly within what's left of the insurance coverage and doesn't require Apollo to pay more, at least on the terms as initially agreed. Is my assessment correct? Your assessment that trial counsel was aware of the insurance situation is certainly not in dispute. I think that is correct, Your Honor. I think with respect to the liability issue, you have to go back a step further. What the record shows, and I direct you to page 809 of the record, is that National Unions Coverage Council was informed by NERO, which is a very prominent economic consulting firm, in May of 2011, that Apollo faced potential damages in excess of a billion dollars. Then in September 2012, so we're talking about a year and a half in advance of any settlement, Apollo's trial counsel informed National Union that liability is going to be at least hundreds of millions of dollars on remand, potentially over a billion. In that call with National Unions Coverage Council, National Unions Coverage Council said there is, quote, no prospect of downside, no downside exposure. No prospect of downside exposure. Okay. The question before this court is, could a reasonable jury find that that was unreasonable to dismiss outright the conclusions of NERO, the conclusions of highly qualified outside counsel, that in fact, Apollo did face this exposure? There's nothing in the record to suggest between September 2012, when that conversation occurred, and National Union's final refusal to consent, which occurred in October 2014, that National Union once revisited that off-the-cuff conclusion that there's no prospect of downside exposure, notwithstanding NERO's conclusion. The meaning of no downside exposure? Exposure for whom? Well, I believe, based on the record in this case, that Mr. Fitzsimons, who was Apollo National Union's coverage counsel, was referring to the insured's exposure. I think that's a patently unreasonable conclusion. If he was referring to National Union's exposure, it would be even more supportive of a bad faith claim that we have. I guess I don't understand the comment in either context, which is what prompted the question. Didn't the district court utilize some sort of an objective standard? No. He used the term objectively. The district court, at the urging of National Union, relied on bad faith case law and a stray comment from landlord-tenant restatement to hold that it considered the terms of the backdating settlement and it did not act with unreasonable caprice, whim, or prejudice. Now, it never analyzed in any way whether or not the backdating settlement was objectively reasonable. Any of the factors set forth by the court in Morris and Tenney, which say you have to look at what would a reasonably prudent insured in this situation pay with its own money to settle the case? Did it have its own counsel sort of monitoring the negotiations? Did National Union? Yes. Yes, it did. It had an outside counsel. And did he offer or he or she offer an opinion as to the reasonableness of the settlement? What the record reflects, there is nothing in the record that National Union contemporaneously offered its rationale to Apollo as to why they were refusing to consent. At the answering brief, page 70, National Union claims that those reasons were explained. If you look carefully at the record sites in National Union's answering brief, those refer to conversations that occurred in 2012, in the fall of 2012, more than a year and a half before the settlement was proposed by the mediator and accepted by Apollo. There is no contemporaneous explanation of why either National Union or its coverage counsel rejected the conclusions of Morgan Lewis's attorney, who was intimately familiar with the matter, Winston and Strawn's, the head of their appellate practice, who was intimately familiar with the matter. They rejected those out of hand. And the question for this court is, could a reasonable jury conclude that National Union acted unreasonably in refusing to consent to an objectively reasonable settlement? The answer to that question has to be yes, and that's why the district court is wrong, whether you apply Morris or whether you apply principles that courts in coverage cases across the country. You seem to be importing sort of two levels of reasonableness. One is, according to your analysis, one looks to the reasonableness of the settlement, right, which is from the perspective of whom? The insured, Your Honor. The insured. Correct. And that's clear from Arizona law or these other cases. Okay. And then in terms of whether the insurer has acted reasonably or unreasonably, whose perspective is that from? That would really go to the bad faith question, Your Honor, because the insurer is obligated absent exceptional circumstances in terms of lack of notice or lack of opportunity considered to consent to an objectively reasonable settlement. If they do that unreasonably, that is not only a breach of contract, but that's a bad faith claim, and that's why we think the district court got both claims wrong. We've read some of the treatises that the parties have talked about, National Union has talked about. There's criticism of Morris, as you know, and concerns about, it seems to me, Morris. Why doesn't that point to the fact that actually in the context of directors and officers' policies, where the phrase, that's the insurer's money that's being played with, generates a different analytical framework, and so Morris does not decide the issue? Well, even when, which I think is the treatise you're referring to, indicates that if an insured pays its own money to settle a claim and then seeks reimbursement, there is a presumption that the settlement is reasonable because the insured is putting its skin in the game and giving itself risk. And that's very different than the Morris and Dameron cases where you have an assignment without any risk to the insured. So I see I'm down to a minute. I'll give you another minute. Thank you very much, Judge. We'll hear from you. May it please the Court, my name is Ben Cooper and I represent National Union. This Court should affirm the summary judgment of the District Court because as a matter of law, because of our undisputed fact, it was simply not unreasonable for National Union to withhold in 320 pages of what could only be considered tour de force, tightly written analysis. The phrase that concerns us is insurer's consent shall not be unreasonably withheld. Isn't that ambiguous? No, I don't think it is. What does it mean? I don't know what it means. I read it, I keep looking at it. Does it mean from the insurance perspective? Can the insurer do just what they did here and that's fine? All they've got to do is look at this and say, ah, we're not going to consider it everything. We don't think this settlement is premature. We think you should litigate it. It's ambiguous to me. With all respect, Your Honor, neither side- Tell me why it's not ambiguous in light of Arizona. It's not because the phrase, first of all, the text of the language is clear, which is that you're looking at whether the insurance company unreasonably withheld consent. And while that phrase may be susceptible to construction, the only courts that have construed it, the one we cited, actually it was Apollo that cited it was the Schwartz case, which says you have to look at the reasonableness of the decision made by the actor who's being judged by their unreasonableness. And while the settlement itself may be come into that analysis, it's part of the analysis of saying, did the insurance company act unreasonable? Because that's what it is. Your reason cites an objective standard, objective reasonableness. What's the objective here? Is that simply the insurer's perspective? Yes. You would ask, did the insurance company have objectively reasonable grounds? And subjectively, did it act, even if it had objectively reasonable grounds, did it act, actually act for subjectively outrageous grounds like whim or comprehension? What case states both propositions? What is your home run case? Unfortunately there's no home run case in Arizona because the background principle that you operate in is you look at the construction of the statute, the construction of the policy language to act unreasonably. In other situations where you look at whether insurance companies act unreasonably, the Arizona courts use a two-pronged analysis that is objective reasonableness. Did they have reasonable grounds for doing it? And then subjective unreasonableness. But those cases are not insurance policy cases. No, they are insurance cases, but they're not construing the word unreasonably. But I would say that in... Why shouldn't we ask Arizona or request that Arizona resolve this issue? Your Honor, I'm always happy to ask my home Supreme Court what they say about this, but I think the reason you don't have to in this case is because the alternative body of case law that they're suggesting, that is the Morris-Dambron cases, which are... Which you don't actually mention Morris in your opening, in your brief. No, we do discuss Morris, and we cite Morris and Dambron. Morris and Dambron are not based on policy language. Morris and Dambron are well-known to insurance bad-faith lawyers in Arizona because they arise out of particular dynamics and rights and obligations of someone who is being defended under duty to defend by an insurance company, and where the insurance company is both controlling the defense and controlling the settlement. And the insurance company does something, takes some kind of act, which puts the insured in a precarious position, whether it's denial of coverage, which is a Dambron type agreement, a Dambron type situation, or in this case, a reservation of rights. And what Morris said is, you have a duty to defend, the insurance company is controlling settlement, the insurance company there was arguing that the insured entering into a settlement by itself was a breach of the duty of cooperation, given that the policy put control of settlement in the hands of the insurance company. And so the court was trying to come up with a mechanism to handle that dynamic, where you have control vested in one party, but the other party goes out and settles. And what the court said in Dambron was, and Chief Justice Feldman's opinion, is, quote, whether an insurer may assert the policy's cooperation clause to prevent insureds being defended under a reservation of rights from protecting themselves by settling. So that is the reservation of rights, or in the case of a Dambron situation, the denial of coverage outright, put the insured in what was called a precarious situation, one of great economic peril. Here, there was no predicate act, whether a reservation of rights or a breach, by the National Union. That is, that put someone who was being defended at risk. That is, the dynamics weren't there. The con belonged to Apollo. Apollo was conducting its own defense, subject to reimbursement of fees above a self-insured retention, and Apollo also had control of the settlement. They chose to settle at a point when basically everything was said and done. That is, this is unlike any of those other cases he cited, where you actually have the court ruling, and not just ruling, but ruling in three... You only have a district court. You have a trial court. That's correct. But if you're saying, what are the appellate... If they have their counsel saying, and they rely on the statements, oh, this was a great deal, or what were the appellate risks? It was 50-50. Well, I can tell you, as an appellate lawyer, that's what appellate lawyers always say. It's 50-50, because you want to hedge it. And that was the opinion... It probably wasn't zero. As an appellate lawyer, do you often tell your clients, don't worry about the Ninth Circuit. They never, ever, possibly ever set aside a district court order. I have infinite faith, Your Honor, and I express it to my clients in the wisdom of the Ninth Circuit. But in this case... Which may not, 100% of the time, coincide with the wisdom of the district judge. That is correct. But I think this is an extraordinary case. If one takes the time to go through the 320 pages of very tight, specific analysis... Let me... I still want to get back to the policy language. Yes. Under the language of the policy, to what extent is the insurer supposed to take into account the interest of the insured? Well, Your Honor... In going through that calculus that you just... In going through the calculus, and I think the district court recognizes that you have to give equal consideration. That's part of the duty of good faith and fair dealing in all insurance contracts. You have to look at what the concern is, and you have to balance it, but you don't just give way... Well, do we know what considerations the insurance company's coverage counsel had about... Your Honor, yes. Is there a record? I mean, we know what the insurer's... I mean, the insured's lawyer's positions were. Yes. There was extensive testimony in the record about what National Union thought, why it decided not to consent. What Mr. Whitney says is, well, there's no contemporaneous communications. That's because all the communications contemporaneous to the settlement took place in the course of the mediation. They were all mediation privilege. But there is... So we don't... We have no idea. We don't... That's not correct. We have deposition... Where can I look in the record, if you could point me to that? Yes. You can look... Where I could read what coverage counsel's, in the insurance company's coverage counsel's assessment was. Yes. If you look at our statement of facts and the appended testimony, it's supplemental excerpts of record pages 79 to 85. Supplemental excerpts of record at... 79 to 85. And that's going to tell me what the insurance company's coverage counsel assessment was and the likelihood of what was going to happen on a deal. It's two. And at pages 49 through... Paragraphs 49 to 78 of the statement of facts and the appended testimony. Yes. It was not just National Union's outside counsel. It was also Reed Kleinly, their in-house adjuster, who's also an attorney, but who... An experienced claim adjuster who deals with these kinds of policies. So it's what National Union believed based on the testimony, deposition testimony of both Mr. Kleinly and the outside counsel. One other question I have for you is, when you talk about unreasonableness, unreasonably withheld, it sounds like a factual... Your Honor... It's factual to me. In the context of these insurance disputes, it's factual unless there's no dispute of facts. And here there is no dispute of facts. What you're asking, what the district court said is, it's a matter of law. That's correct. But this is... They didn't unreasonably withhold their consent. That's correct. And so you have to ask, well, what's... A pretty steep hurdle, right? But one that's surmounted in a lot of cases, including before this court, Your Honor. You have to ask, what is the issue of fact? And what they've put up is two things. First, a damages number. And they're all suddenly talking about NERA, something you didn't hear about in their briefs. In fact, there was a preliminary analysis that hadn't been adjusted for any of the things in the judge's rulings. And their own counsel, Mr. Florin, said that that number, those numbers, damages claims were, in his word, ridiculous. In fact, when we got down to the settlement hearing before the district judge, Judge Reyes at that point, the plaintiffs... The underlying litigation. The underlying litigation. The sworn affidavit from the plaintiff's counsel was, well, actually their damages were in the $40 million range. And that's the Wood Declaration. And that's why we cited the Wood Declaration. So you have to ask, well, the appellate risk, you know, saying 50-50 doesn't mean very much unless you tell everybody what is the risk. So you look in their briefs to see, well, what's the risk of reversal? Where did Judge Where was the Ninth Circuit going to reverse? And you read through his exemplary opinions and his detailed analysis of the case law and the facts and say, well, where was it? You get this vague assertion, well, he kind of flipped from Apollo 1 to Apollo 3. But they never quite say, what do you mean by that? And, in fact, Judge Broomfield carefully explains what he decided in Apollo 1 and what he decided in Apollo 3. And there's no flip. There's no inconsistency. What the judge said was, in Apollo 1, he said they've identified five grants, specific grants, of backdated stock options. And he said all these are time-barred. And he said the rest of the 100 grants they've abandoned because they don't say anything about them. And that was never appealed, his holding that the other 100 are out because there were no allegations as to them. And he says, well, there are two kinds of claims that were being disposed of here. One is backdating by itself. That is, the backdating was the fraud. And second, it's the misrepresentations in the financial statements as a result of backdating. And he says, in the Apollo 1, the supposedly inconsistent ruling, he says, well, the false of the allegations are improper. I can't even evaluate them because they're not particularized. You have to redo this. He says that they're troubling. I don't know why any of these supposed statements are false. And so you've got to replete this. And he says, well, assuming they can fix this and plead falsity, I'll go into the discussion of scienter. He says scienter is a close call, but time will go to the plaintiff. And then he deals with loss causation. Well, then he comes back in Apollo 3, in the Second Amendment complaint. And Apollo briefs us brilliantly, by the way, on appeal. We've got the principle briefs on appeal. So it's not conjectural what the appeal is going to look like. We know how the issues are framed on appeal. And they add a sixth, in the Second Amendment complaint, a sixth grant. And Judge Broomfield goes through it and he says, you know, I look at all these things and there's no backdating here. There's simply no allegation, particularized, of backdating. And he says, you know, now that I'm looking at it, this has really got me concerned. That I took everything on face value that the plaintiff said in the first, in Apollo 1, in the First Amendment complaint. I'm going to look at those too. And he goes through it all and he says, there's no backdating in here either that's adequately put. So there's just no underlying backdating, either for the backdating claims or for the security statements claims that are based on backdating. So then he looks at falsity and he says, you know, I gave them a chance to fix falsity and they come back with this stuff. And if you examine the allegations, you can't show that any of these statements are false. Because there's no connection between the restatement to the actual alleged grants of backdated stock options. That is, you get a big number but no connection as to the amount by which those financial statements were encrypted. I'm sorry to jump in, but your time is running out. Yes. If you lose on the breach of contract claim, do you also lose on the bad faith claim? No. Normally bad faith has a higher standard because the standard for a bad faith claim, particularly first party bad faith claim, is well established in Arizona law. A bad faith claim in Arizona under the Nardelli standard in 2012 requires both objective and subjective bad faith. And in this case, there's no evidence of subjective bad faith. On the Cobley letter, the district court said that it would not have been shared or forwarded with National Union but for the mediation. Was that the right legal standard? Yes, it was. And in fact, we know it was written on February 6th and that it was sent to National Union as an attachment to the Herman letter on the 7th. Because it was a mediation communication and Mr. Herman says, in regard to whether or not you should be putting more money on the table, here's an analysis we just got from the appellate counsel. So that was absolutely the correct ruling on this. With the exclusion of those letters, what do we have in the record to assess reasonableness? Well, Your Honor, you can look at the testimony which I've cited to Judge Paez about what they said that they considered. But it's well established under the California mediation privilege that what happens in mediation stays in mediation. And if they wanted to establish a different record, they had to come out of mediation and start putting out, redoing the discussions. But they didn't. That stuff is simply under the mediation privilege. But we're over your time. Thank you, Your Honor. Thank you. In light of my brief time, I'm going to try to make five quick points. I think the most important is to correct Mr. Cooper's statement regarding the reservation of rights issue. It's undisputed in this case that National Union did in fact issue a reservation of rights. It's at 985, Volume 5, as well as 788, Paragraph 2, Volume 5. Secondly, with respect to the ambiguity issue, the district court supplemental excerpt of record, page 3, found this phrase ambiguous, but yet failed to construe it in the favor of the insured, which is required by Arizona law. That is yet an additional error. Number three, the Schwartz case that Mr. Cooper referred to, the Second Circuit, look at the Second Circuit opinion, page 145 of that opinion. The test the Second Circuit adopted, not the district court, in affirming the judgment against the insurer, was could a reasonable jury have found that the settlement reflected a reasonable sum? And the Second Circuit said yes, and that's enough to affirm the verdict. So that's the standard the Second Circuit adopted. With respect to the reasons that National Union and its Coverage Council came up with in refusing to consent to the settlement, there is no contemporaneous evidence of that whatsoever. The first evidence about their supposed reasons at the time were given in deposition testimony in 2016, two years after they refused to consent. They never once conveyed to Apollo, and there's no evidence that they conveyed to Apollo, why they thought this settlement was unreasonable and why they were refusing to consent. So if the letters are excluded pursuant to the various mediation privileges, what do we look to to assess reasonableness? Well, I think you have to look with the evidence presented. And this court in Amadeo said they reversed a bad faith claim against the insurer in that case because the record reflected the insurer ignored contrary evidence. That's what the record reflects. The insurer was given evidence regarding the risk on appeal, given evidence regarding the liability, didn't address it, and refused to consent. I see my time is up. What evidence? Is it still the letters that are the subject of the mediation privilege claim? Is there anything else that we have that tells us what it was the insurer was in a position to consider at the time that it decided not to fund the settlement? There is evidence, Your Honor, between September of 2012 when the first settlement demand came in and the invocation of the mediation privilege in January 2013 regarding trial counsel's assessment of the risk on appeal, the horribly unattractive position they would be in on remand, the fact that defense costs would erode coverage by themselves. All of that is in the record, Your Honor. What National Union did with that information is not in the record. Thank you very much. Thank you, counsel. We appreciate the arguments from both sides. Thank you very much.
judges: Paez, Clifton, Katzmann